**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF NEBRASKA**

IN RE:

THE GREAT PLATTE ROAD RIVER
MEMORIAL FOUNDATION

　　　　Debtor.

CASE NO. BK 13-40411 TLS

CHAPTER 11

## DEBTOR'S DISCLOSURE STATEMENT

## ARTICLE I

### Introduction

The Great Platte River Road Memorial Foundation (the "Foundation" or "Debtor"), seeking to restructure its finances and hoping to remain open to fulfill its historical, educational and cultural purposes, filed its voluntary bankruptcy petition on March 6, 2013 (the "Petition Date") pursuant to Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code").  The case is pending in the United States Bankruptcy Court for the District of Nebraska ("Bankruptcy Court").  This Disclosure Statement is submitted by the Foundation pursuant to §1125 of the Bankruptcy Code to each holder of a Claim who is impaired under the accompanying Plan of Liquidation ("Plan") and to other interested person in order to solicit acceptances of the Plan.  All capitalized terms used herein shall have the meaning assigned in the Plan unless otherwise defined.

A deadline for filing objections or resistances to this Disclosure Statement will be set by the Bankruptcy Court, and notice thereof will be sent to all creditors and other parties in interest.  If no objection or resistance is presented, Debtor will submit to the Bankruptcy Court a proposed Order approving this Disclosure Statement and providing

for further proceedings for confirmation of the Plan. Should objections or resistances be presented, the Bankruptcy Court will set a date for a hearing on this Disclosure Statement, and notice will be given thereof. The purpose of such a hearing will be to consider such objections or resistances as may be filed, and to determine whether the Disclosure Statement, including any amendments hereafter made, should be approved.

AMENDMENTS TO THE PLAN'S CLASSIFICATION OF CLAIMS AND TREATMENT OF ONE OR MORE CLASSES, OR OTHER AMENDMENTS OR MODIFICATIONS THAT DO NOT MATERIALLY AND ADVERSELY CHANGE THE TREATMENT OF ONE OR MORE CLASSES, MAY BE MADE TO THE PLAN. SUCH AMENDMENTS MAY BE APPROVED BY THE BANKRUPTCY COURT WITHOUT NOTICE TO PARTIES IN INTEREST WHOSE INTERESTS ARE NOT MATERIALLY AFFECTED BY SUCH CHANGES OR MODIFICATIONS.

If the Plan is accepted by the requisite majorities of classes of creditors and is confirmed by the Bankruptcy Court, holders of Claims, whether or not voting, will be bound by the terms of the Plan and its provisions. Under certain circumstances, a Plan may be confirmed without acceptance by some parties in interest or classes of them. Holders of Claims not voting will not be counted in determining acceptance or rejection of the Plan. Allowance of a Claim for voting purposes does not necessarily mean that the claim will be allowed or disallowed for purposes of distributing the consideration provided by the Plan. Any Claim to which an objection has been made, whether or not recognized for voting purposes, will be allowed for purposes of distribution only as determined by the Bankruptcy Court, or by the agreement of Debtor and the holder,

2

which determination will occur after confirmation of the Plan.  Acceptance of the Plan by the holders of every Claim is important.

The Plan may be confirmed by the Bankruptcy Court only if it is accepted by the holders of 2/3 in amount and more than 1/2 in number of the Claims of each class of creditors voting on the Plan.  In the event the requisite acceptances are not obtained, the Bankruptcy Court may, nevertheless, confirm the Plan if the Bankruptcy Court finds that the Plan accords fair and equitable treatment to any class rejecting the Plan.

DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO THE TREATMENT OF HOLDERS OF CLAIMS.  THE DEBTOR HAS PROPOSED THE PLAN AND RECOMMENDS THAT HOLDERS OF CLAIMS AND INTERESTS VOTE TO ACCEPT THE PLAN IN ITS PRESENT FORM.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ADEQUACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN OR THE PROVISIONS THEREOF BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS BEEN COMPILED FROM INFORMATION MAINTAINED BY, OR AVAILABLE TO, DEBTOR.  ALTHOUGH THE INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO THE BEST OF DEBTOR'S KNOWLEDGE, THERE CAN BE NO ASSURANCE THAT THE INFORMATION HEREIN CONTAINED IS CORRECT OR COMPLETE IN ALL MATERIAL RESPECTS.

THE STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN ANY FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF HOLDERS OF CLAIMS AGAINST  DEBTOR WHOSE CLAIMS ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION WITH REGARD TO VOTING ON THE PLAN.  THIS DISCLOSURE STATEMENT MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE ADVICE ON THE LEGAL, TAX, OR OTHER EFFECTS OF THE PLAN AND THE REORGANIZATION OF DEBTOR'S AFFAIRS ON HOLDERS OF CLAIMS.

NO REPRESENTATIONS CONCERNING DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE UNDERSIGNED COUNSEL FOR DEBTOR, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM APPROPRIATE.

## ARTICLE II

## Plan Voting Instructions and Procedures

### A.  Notice to Holders of Claims and Interests

This Disclosure Statement will be transmitted to holders of Claims that are entitled under the Bankruptcy Code to vote on the Plan.  See Article VI for a discussion and listing of those holders of Claims that are entitled to vote on the Plan and those holders of Claims and Interests that are not entitled to vote on the Plan.

### B.  Solicitation Package

Along with the mailing of this Disclosure Statement, and as part of the Plan solicitation process prescribed by law, Debtor will send copies of: (i) the Plan; (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); and (iii) if you are the holder of a Claim entitled to vote on the Plan, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan.

### C.  Voting Procedures, Ballots and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. You must complete and return your original Ballot (copies will not be accepted) and return it in the envelope provided.  In voting to accept or reject the Plan, you must use only the Ballot or Ballots sent to you with this Disclosure Statement.

ALL CREDITORS IN THIS CHAPTER 11 CASE WILL BE SOLICITED FOR A VOTE FOR OR AGAINST CONFIRMATION OF DEBTOR'S PLAN.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [DATE], (THE "VOTING DEADLINE") BY DEBTOR.

If you have any questions about: (i) the procedure for voting your Claim or Interest or with respect to the packet of materials that you have received; or (ii) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure ("Rule") 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

**GREAT PLATTE RIVER ROAD MEMORIAL FOUNDATION**
**c/o T. Randall Wright or**
**Eric J. Adams**
**Baird Holm LLP**
**1700 Farnam Street, Suite 1500**
**Omaha, NE 68102**
**Phone: (402) 344-0500**
**Fax: (402) 231-0588**

**D.  Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to §1128 of the Bankruptcy Code and Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for [INSERT DATE AND TIME].  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections

to Confirmation of the Plan must be filed with the Bankruptcy Court not later than
[INSERT DATE].

## ARTICLE III

### History of the Foundation

**A.  Foundation Background**

The Debtor was formed as a non-profit entity, organized under the laws of the state of Nebraska.  In March, 1998, the City of Kearney, NE issued $59,780,068.50 in Industrial Revenue Bonds.  The proceeds of the Bonds were loaned by the City to the Foundation under a Loan Agreement with the Foundation dated as of March 1, 1998. The Loan proceeds were used to acquire real property rights and easements, and to construct an eight-story high archway and related structures spanning Interstate 80 near Kearney, NE.  Pursuant to the terms of the Loan Agreement, the Bonds are secured by, among other things a mortgage (the "Mortgage") on the Foundation's real property and improvements.

The Bonds are special and limited obligation bonds of the Issuer, payable from the revenues and income derived from the Arch and payable pursuant to the Loan Agreement.

The Arch was constructed in 1999.   The Foundation entered into an Air Lease with the State of Nebraska Department of Roads, which, among other things, permitted the Arch to occupy the space over U.S. Interstate 80. The Arch opened its doors June 9, 2000.   However, from the beginning, it was unable to generate funds as great as those that had been projected.   This was due in part, but not entirely, to the fact that an anticipated exit from Interstate 80, near the Arch, was not constructed, leaving those

who wanted to visit the Arch having to travel several more miles than was anticipated. In addition to that problem, there were many fewer visitors to the Arch than expected.

## B. Default on Loan Agreement

The Foundation defaulted on the Loan Agreement in 2002, when there were insufficient funds in the Debt Service Fund to pay interest due on July 1, 2002. The Bond Trustee, Wells Fargo, gave notice of the default to the City and the Foundation, and on November 15, 2002, Wells accelerated the Bonds based on the default.

Thereafter,  Wells Fargo petitioned for instruction in the administration of the bond trust to the Fourth Judicial District in  Hennepin County, Minnesota, and as a result of proceedings there, Wells Fargo, as Trustee, released and discharged its rights, remedies and liens under the original Bonds and new Bonds, totaling $22,000,000.00 (the "New Bonds") were issued.  The New Bonds are secured by a mortgage on the real property.

As of the Petition Date, the amount due to bond holders was approximately $20,000,000, plus interest.

## C. Facilities and Operations

The Arch houses a museum and educational facility which features various media presentations concerning the history of the Plains and especially the Nebraska Platte River area.  The Arch provides related educational and cultural services.  There is also a gift shop on the premises.  The Arch earns revenue by charging admission and also receives revenue from the gift shop.  However, all combined revenue has never been sufficient, on an annual basis, to pay for all of the annual operating expenses and debt service.

## ARTICLE IV

### Events Leading to the Chapter 11 Case

Realizing that it might soon run out of operating funds, in 2012, various members of the Board of Directors of the Debtor began exploring fund raising as a possible way to keep the Arch open.  They soon found that although there was reasonably strong community support for the Arch, many potential donors were unwilling to donate so long as the $20,000,000 debt to the bond holders remained as a debt against the property. That debt was so large that it left potential donors believing that a donation could not have any substantial positive impact on the future of the Arch.

As a result, the Board of Directors contacted bankruptcy counsel, hoping that a Chapter 11 filing might result in a plan of reorganization that could better address the Foundation's ability, or inability, to deal with that debt.

On March 6, 2013, the Foundation filed its Chapter 11 petition.

## ARTICLE V

### The Chapter 11 Case

**A.  Impact of Bankruptcy Filing**

Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on March 6, 2013.    A Chapter 11 bankruptcy case, among other things, has two  important characteristics: (1) unlike a Chapter 7 bankruptcy, the debtor is allowed to retain possession of its assets in a fiduciary capacity and is allowed to operate its business in the ordinary course of business without the need to seek court approval for most actions; and (2) it grants the debtor relief from its creditors and most pre-petition obligations so that the debtor may be able to reorganize its debts in an

orderly manner, or, if need be, assemble and/or liquidate it assets pursuant to a proposed plan of reorganization or liquidation.   Since the Petition Date, Debtor has maintained control of its assets as a debtor-in-possession pursuant to §1107 of the Bankruptcy Code and has continued to operate its business in the ordinary course pursuant to §1108 of the Bankruptcy Code.   As a debtor in Chapter 11, Debtor has complied with the various reporting requirements under the Bankruptcy Code, including the filing of monthly operating reports which are available through the Bankruptcy Court.

Another important protection afforded a debtor in bankruptcy cases is the automatic stay under §362 of the Bankruptcy Code, which arises without notice and is effective against third parties regardless of whether such third party has actual knowledge thereof.   The automatic stay prevents and prohibits nearly all other entities from undertaking or continuing almost all actions or other acts that seek, directly or indirectly, to interfere with, hamper, or affect Debtor's operations and assets, including prepetition lawsuits filed against Debtor.

## B.  First Day Motions

It is typical in Chapter 11 bankruptcy cases for Debtor to file "first-day-motions", though the this term is a misnomer as these types of motions may or may not be filed on the first day of the bankruptcy.   First-day-motions are intended to facilitate the transition between a debtor's prepetition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.   The first-day-motions granted in this Chapter 11 Case are typical for large Chapter 11 cases.   The first-day-orders authorized in this Chapter 11

Case included: (1) Motion to Pay Certain Pre-Petition Wages, Salaries, and Benefits (2) Motion for Order to Provide Adequate Protection to Utilities.

## C.  No Creditors' Committee Has Been Appointed

The United States Trustee for the District of Nebraska has advised the Foundation and the Bankruptcy Court that a committee under 11 U.S.C. § 1102 was not appointed because an insufficient number of persons holding unsecured claims against the debtor had expressed interest in serving on a committee.

## D.  Summary of Claims Process and Claims Bar Date

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") with the Bankruptcy Court in April of 2013.  Among other things, the Schedules and Statements set forth the Claims of known creditors against Debtor as of the Petition Date, based upon Debtor's books and records.

The Bankruptcy Court established July 3, 2013, as the Claims Bar Bate in this case.  All creditors and parties in interest were asked to submit a Proof of Claim to the Bankruptcy Court by this deadline.

## E.  Claims Against Debtor

Administrative expense claims are claims allowed by the Bankruptcy Court for the necessary administration of Debtor's Chapter 11 case that are generally payable after the claims of secured creditors but before the claims of unsecured creditors. Accrued but unpaid administrative expense claims as of the date hereof include primarily the fees owing to Debtor's counsel, in the approximate amount of $20,000.

## ARTICLE VI

### The Plan

The Plan of Reorganization is attached hereto as Exhibit "A".  You are strongly urged to read the full Plan of Reorganization.

### A.  Nature of a Bankruptcy Plan

A Chapter 11 Bankruptcy is used primarily by businesses and allows a debtor to maintain ongoing business operations while working to effectively reorganize and restructure its debts.  The ultimate goal of any Chapter 11 case is the confirmation of a plan of reorganization.  The requirements of any plans of reorganization are governed by 11 U.S.C. §§ 1121-1129.  Generally, a debtor has wide latitude to craft its reorganization, although there are certain requirements that much be included in every proposed plan.

A typical plan organizes all the claims against a debtor and segregates them into separate classes of claims.  The debtor is permitted to organize these classes as it sees fit.  However a claim may be placed into a particular class only if it is substantially similar to other claims in the same class.  For example, two general, non-priority unsecured claims may be placed into the same class, but a general, non-priority unsecured claim cannot be placed into the same class as a secured claim.  Once all of the claims against a debtor are appropriately classified, the plan will then provide for the treatment, or payment, of all claims in a way not inconsistent with the Bankruptcy Code. The plan must also provided and describe the mechanism by which the plan, and the treatment of classified claims as described therein, will be implemented.

## B.  Classification and Treatment of Claims

Classification of claims in a chapter 11 bankruptcy case is governed by 11 U.S.C. §1122.  Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  Debtor's Plan contains two separate classes, but does not, as is permitted by §1123(a)(1) of the Bankruptcy Code, classify certain administrative claims.  These classes are: (i) Class One: Wells Fargo as Trustee for Bondholders; and (ii) Class Two: Allowed Unsecured Claims.

Pursuant to the Plan, the Debtor will pay the Trustee of the Bondholders the sum of  $50,000 in cash, in complete satisfaction of their claims, liens, and security interests.  Class Two Claimants will receive $50,000, to be distributed pro-rata among members of that class who have Allowed Claims.

Holders of Class One and Class Two Claims are impaired and shall be entitled to vote on the Plan.

## C.  Means of Implementing the Plan.

The Foundation expects that its revenues from paying visitors to the Arch will increase after the new interstate exit near the Arch opens later this year.  That exit, which has been in the planning or construction phase for a number of years, will provide much better access to the Arch than the nearest existing exit.  Although it is difficult to judge the financial impact that the new exit will have, the Foundation's board members believe it will increase attendance and therefore revenues.

Of perhaps greater immediate significance are the fundraising efforts that have been taking place since the Petition Date.  Various supporters of the Foundation have

engaged in fund-raising efforts that have resulted in signed pledges for donations totaling, so far, approximately $132,000.00.   The pledges are conditioned upon Bankruptcy Court approval of the Foundation's Plan of Reorganization.   The Foundation anticipates raising another $8,000.00 to $18,000.00 in similar donations.  In addition, the Foundation is seeking funding commitments from Buffalo County and the City of Kearney, which have been asked to provide annual funding for a period of several years to assist the Foundation in meeting future operating expenses.  Decisions as to whether those funds will be available may not be made until later this year.  All funds raised from private donors, Buffalo County, the City of Kearney or from other sources will be used to fund the payments under this Plan, and to fund future operations.   The Debtor intends to continue its fund-raising efforts in order to fund operations in the future.

**D.  Assumption of the Air Lease**

As part of the Plan, the Debtor will seek court authority to assume the Air Lease with the Nebraska Department of Road.  Assumption of that Lease is critical to the Debtor's ability to carry on the business of the Arch.

**ARTICLE VII**

**Historical Financial Performance**

Audited financial statements for the years ended 2009, 2010 and 2011 are attached hereto as Exhibits B, C and D.  Because the Foundation is a not-for-profit organization, the financial statements differ in some respects from those of a for-profit organization. However, revenues, expenses and net operating income are shown, as well as increases or decreases in net assets.

The financial statements reflect that in each year shown, the Foundation incurred a net operating loss.   Although audited financial statements for 2012 have not yet been prepared, the Foundation expects they would likewise reflect an operating loss.

## ARTICLE VIII

### Liquidation Analysis

The Arch has a very limited function.  One of the terms of the Air Lease between the Debtor and the Nebraska Department of Roads is that the Arch must not be used for any purposes other than those specified in the Lease.   Those purposes include dramatizing the development of transportation and communications along the Great Platte River Road, memorializing the achievement and vision of pioneers, dramatizing the history of the Great Platte River Road, and inspiring greater understanding and appreciation of its role among people through ongoing education, preservation, restoration and interpretation programs.  As a result, if the Foundation sold the Arch, the buyer would be required to operate it for those purposes.  It could not be operated, for example, exclusively as a restaurant and bar.  This limited purpose most likely means that no other persons or organizations would want to purchase the Arch.

In addition, in the event the Foundation ran out of money with which to operate and fund the Arch, the Arch would have to be torn down, because it cannot be left vacant without violating the Air Lease and eventually becoming a hazard to passing motorists.

However, the Debtor lacks sufficient funds to demolish the Arch—a job which has been estimated would cost between five and ten million dollars.  The scrap value of the

Arch, if it is demolished, would almost certainly be substantially less than the cost of the demolition.

As a result, the Foundation does not believe that the Arch can be sold for an amount which would generate any money for creditors.   Moreover, the Arch is not a building which can be easily sold to another party.  A buyer would not be permitted to change its purpose to that of a commercial enterprise without violating the Air Lease. Since the Arch has never been profitable, and given these restrictions on its functions, the Debtor believes it's sale value is very limited.  The Debtor therefore believes that a liquidation would not result in any significant funds being available to pay creditors.

## ARTICLE IX

### Risk Factors and Other Considerations

The holder of a Claim against Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

1. <u>Uncertainty over future fundraising</u>.  The Foundation's board members are optimistic about its future if this plan is approved.   Nevertheless, it is possible, notwithstanding the fund-raising that Foundation is doing, that the funds raised will not be sufficient to sustain the Arch for a long period of time.  As is true of almost any non-profit organization, it's long-term future depends, to a significant degree, on finding a steady and reliable funding source.  The Foundations supporters have worked tirelessly to identify such sources, and believe they will be successful in securing funding from them.  However, there are no guaranties that such funding will be successful.

2. <u>Controlling of costs</u>.  Some costs, such as utilities and insurance, are outside of the Foundation's control.  In the past, those costs have stayed at a level that the Foundation has been able to manage.  Sudden increases in those costs could result in further operating losses.

3. <u>Visitor Attendance</u>.  The Foundation depends on paid visitor attendance in order to meet much of its operating budget.  Should that attendance drop significantly in the future, for example due to a large increase in the price of gasoline, or other factors that affect interstate travel, the Foundation might not be able to meet its obligations.

## A.  Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3s) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or reject the Plan.

## B.  Value of Debtor's Assets and the Best Interests of the Creditors Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a Bankruptcy Court to determine that the Plan is in the best interests of all holders of claims or interests that are impaired by the Plan and that have not accepted the Plan.   As a condition to the confirmation of a plan of reorganization, §1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each impaired class of claims or interests must receive or retain at least the amount or value it would

receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the Plan.

## C.  Failure of the Plan

Even if all Impaired voting classes vote in favor of the Plan, and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of Debtor, and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code (this is referred to as the best interest of creditors test).  Although Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides for certain conditions that must be fulfilled prior to confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

## D.  Tax Consequences

**1.**   The Debtor is an educational/ charitable, tax exempt organization.  As a result, it pays no income taxes and therefore the tax consequence of this plan to the

Debtor should be minimal, if any.  It is not anticipated that the Plan will give rise to state

and federal income tax obligations for Claimants.

**2. Caveat**

**THESE STATEMENTS ARE INTENDED TO BE ONLY A SUMMARY OF
ANTICIPATED TAX CONSEQUENCES ARISING FROM THE CONFIRMATION AND
EXECUTION OF DEBTOR'S PLAN OR REORGANIZATION.  THESE STATEMENTS
SHOULD NOT TAKE THE PLACE OF INDIVIDUALIZED TAX ADVICE AND EACH
INDIVIDUAL CREDITOR SHOULD SEEK THE ADVICE OF A PROFESSIONAL TAX
PLANNER OR SIMILAR PROFESSIONAL.**

**ARTICLE X**

**Further Information**

If you have questions or require further information about the voting procedure

for voting your Claim or about the packet of material you received, or if you wish to

obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or

appendices to such documents (at your own expense, unless otherwise specifically

required by Rule 3017(d)), please contact Debtor c/o:

> T. Randall Wright
> BAIRD HOLM LLP
> 1700 Farnam Street, Suite 1500
> Omaha, Nebraska 68102-2068
> Telephone:   (402) 344-0500
> Facsimile:    (402) 231-8556
> E-mail:  rwright@bairdholm.com

In addition, this Disclosure Statement, the Plan, the Plan Documents, and other

documents referred to herein, as well as the Bankruptcy Court's calendar and other

administrative matters, may be found, downloaded and printed from the Bankruptcy Court's website found at http://www.ecf.neb.uscourts.gov.

## ARTICLE XI

### Recommendation and Conclusion

For all of the reasons set forth in this Disclosure Statement, Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, Debtor urges all holders of Impaired Claims to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED by Debtor on or before the Voting Deadline.

Respectfully submitted this 20th day of June,  2013.

THE GREAT PLATTE RIVER ROAD
MEMORIAL FOUNDATION, Debtor


By: s/T. Randall Wright
    T. Randall Wright (#16398)
of  BAIRD HOLM LLP
    1500 Woodmen Tower
    Omaha, Nebraska 68102-2068
    Telephone:  402-344-0500
    Facsimile:   402-231-8556
    E-mail:  rwright@bairdholm.com

Its Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Patricia Fahey
ustpregion13.om.ecf@usdoj.gov

Jerry L. Jensen
Jerry.L.Jensen@usdoj.gov

Robert M. Gonderinger
rgonderinger@crokerlaw.com

David J. Skalka
dskalka@crokerlaw.com

Thomas A. Ukinski
thomas.ukinski@nebraska.gov

By: s/T. Randall Wright

DOCS/1183426.3